**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**DIANA MEY,** individually and
on behalf of a proposed class,

Plaintiff,

v.                           **Civil Action No. 5:19-cv-00237-JPB**
                                                        Judge Bailey

**ALL ACCESS TELECOM, INC.;**
**BANDWIDTH INC.; CENTURYLINK**
**COMMUNICATIONS, LLC; LEVEL 3**
**COMMUNICATIONS, LLC;**
**INTELIQUENT, INC.; NOS**
**COMMUNICATIONS, INC.;** and
**TELIAX, INC.;**

Defendants.

## ORDER DENYING MOTIONS TO DISMISS

Pending before this Court are All Access Telecom, Inc.'s Motion to Dismiss [Doc. 75] and Defendants Bandwidth Inc., Centurylink, Communications, LLC, Level 3 Communications, LLC, and Inteliquent, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. 78].

In their motions, the defendants seek dismissal on numerous grounds:

(1)     That this Court lacks personal jurisdiction over the defendants;

(2)     That the Second Amended Complaint fails to state a claim upon which relief may be granted;

(3)     That as common carriers, the defendants are immune from TCPA liability;

(4)     That the plaintiff has failed to join an indispensable party; and

1

(5)     That the TCPA was unconstitutionally invalid during the period in which the calls were made.

"A motion to dismiss under Rule 12(b)(2) is a test of the Court's personal jurisdiction over the defendant.  '[W]hen, as here, the court addresses the question [of personal jurisdiction] on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a prima facie showing of a sufficient jurisdictional basis to survive the jurisdictional challenge.' *New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989))." *Lincoln v. Ford Motor Co.*, 2020 WL 5820985, at *3 (D. Md. Sept. 29, 2020).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (applying the *Twombly* standard and emphasizing the necessity of **plausibility**).  When reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must assume all of the allegations to be true, must resolve all doubts and inferences in favor of the plaintiff, and must view the allegations in a light most favorable to the plaintiff. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' [*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)].  'A pleading that offers "labels and

2

conclusions" or ... "naked assertion[s]" devoid of "further factual enhancement" will not suffice.'" *Lincoln*, *supra* (quoting *Twombly*, 550 U.S. at 555, 557).

**The plaintiff has alleged sufficient facts to support a finding of jurisdiction.**

Each of the defendants seeks dismissal on the basis that this Court lacks personal jurisdiction. "Under Rule 12(b)(2), a defendant 'must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge.' *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). The plaintiff must establish personal jurisdiction by a preponderance of the evidence but need only make a prima facie showing. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). In considering whether a plaintiff has met this burden, a court may look beyond the complaint to affidavits and exhibits in order to assure itself of personal jurisdiction. *Grayson*, 816 F.3d at 269. A court must also 'construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction.' *Combs*, 886 F.2d at 676." *UMG Recordings, Inc.  v.  Kurbanov*, 963 F.3d 344, 350 (4th Cir.  2020).

"Under a 'long-arm' statute, such as West Virginia Code § 56-3-33, a state may enable its courts to exercise personal jurisdiction over non-residents that commit certain acts within the state, or certain acts outside of the state, that have caused injury within the state. *See Lozinski v. Lozinski*, 185 W.Va. 558, [563,] 408 S.E.2d 310, 315 (1991) ('The intent and benefit of any long-arm statute is to permit the secretary of state to accept process on behalf of a nonresident and to view such substituted acceptance as conferring personal jurisdiction over the nonresident.'). Because the West Virginia long-arm statute

3

is coextensive with the full reach of due process, it is unnecessary to go through the normal two-step formula for determining the existence of personal jurisdiction. *In re Celotex Corp.*, 124 F.3d 619, 627–28 (4th Cir. 1997). Instead, the 'statutory inquiry merges with the Constitutional injury,' and this Court must determine whether exercising personal jurisdiction is consistent with the due process clause. *Id.* at 628; *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980)." *Mey v. Castle Law. Grp., PC*, 416 F.Supp.3d 580, 584 (N.D. W.Va. 2019) (Stamp, J.).

"Due process requires that a defendant receive adequate notice of the suit and be subject to the personal jurisdiction of the court. *Id.* (citations omitted). The exercise of personal jurisdiction over a non-resident defendant is proper only so long as 'minimum contacts' exist between the defendant and the forum state, 'such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice."' *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940))." *Id.*

In this case, there is no argument that this Court lacks general jurisdiction over the defendants. Rather, the plaintiff asserts specific jurisdiction. "The minimum contacts inquiry requires [plaintiff] to show that [defendant] 'purposefully directed his activities at the residents of the forum' and that [plaintiff's] causes of action 'arise out of' those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citation and quotation omitted). The inquiry is designed to ensure that [defendant] is not 'haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts.' *Id.* at 475. In other words, it protects him from having to defend himself in a forum where he did not anticipate being

4

sued. *See **World–Wide Volkswagen Corp. v. Woodson***, 444 U.S. 286, 297 (1980); *see also **ESAB Group, Inc. v. Centricut, Inc.***, 126 F.3d 617, 623 (4th Cir. 1997) (underscoring that minimum contacts must have been so substantial that 'they amount to a surrogate for presence and thus render the exercise of sovereignty just')." ***UMG Recordings, Inc.***, 963 F.3d at 351.

"More recently, the Supreme Court also stressed that the minimum contacts analysis must focus 'on the relationship among the defendant, the forum, and the litigation.' ***Walden v. Fiore***, 571 U.S. 277, 283 (2014) (explaining that the '"minimum contacts" analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there'); *see **Bristol–Myers Squibb Co. v. Superior Court***, —— U.S. ——, 137 S. Ct. 1773, 1781 (2017) ('In order for a court to exercise specific jurisdiction over a claim, there must be an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.')." ***Id***.

The Fourth Circuit has "synthesized the due process requirements for asserting specific personal jurisdiction into a three-prong test: '(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable.'" ***Id***. at 351–52.

As noted in ***Abedi v.  New Age Med. Clinic, P.A.***, "[t]he first part of the three part test encompasses two distinct concepts, 'purposeful direction' and 'purposeful availment.' ***Lazar v. Kroncke***, 862 F.3d 1186, 1201 (9th Cir. 2017).  'Purposeful availment' is

5

generally used to analyze contract claims, while 'purposeful direction' is used to analyze tort claims. *Picot* [*v.  Weston*], 780 F.3d [1206,] at 1212.  The only claims alleged in this case are for violations of the TCPA.  Because TCPA claims sound in tort, see *Lowe v. CVS Pharmacy, Inc.*, 233 F.Supp.3d 636, 643 (N.D. Ill. 2017); *Cayanan v. Citi Holdings, Inc.*, 928 F.Supp.2d 1182, 1207–08 (S.D. Cal. 2013), the Court will limit its discussion to 'purposeful direction.' *Cf. Picot*, 780 F.3d at 1212."  2018 WL 3155618, at *2 n.2 (E.D. Cal. June 25, 2018).

In TCPA cases, courts generally find that specific jurisdiction exists when a defendant makes a call or sends a message into the forum state by targeting a telephone number within the particular forum.   *Shelton v. Nat'l Gas & Elec., LLC*, 2019 WL 1506378, *7 (E.D. Pa.  Apr. 5, 2019).  *See Abramson v. Agentra, LLC*, 2018 WL 6617819 (W.D. Pa. Dec. 18, 2018); *Abedi v. New Age Med. Clinic PA*, 2018 WL 3155618 (E.D. Cal. June 25, 2018); *Abramson v. CWS Apartment Homes, LLC*, 2016 WL 6236370 (W.D. Pa. Oct.  24, 2016);  *Ayers v. Receivables Performance Mgmt., L.L.C.*, 2016 WL 5402962 (E.D. Mich.  Sept.  28, 2016); *Hudak v. Berkeley Group, Inc.*, 2014 WL 354676 (D.  Conn.  Jan.  23, 2014); *Luna v. Shac, LLC*, 2014 WL 3421514, at *3 (N.D. Cal. July 14, 2014) (finding purposeful direction "where Shac intentionally sent text messages directly to cell phones with California based area codes, which conduct allegedly violated the TCPA and gave rise to this action, Shac expressly aimed its conduct at California."); *Baker v. Caribbean Cruise Line, Inc.*, 2014 WL 880634, at *2 (D. Ariz. Mar. 6, 2014) (finding personal jurisdiction where the complaint alleged "that Defendant made calls to Plaintiff's Arizona number and the fact that those calls are the basis for Plaintiff's [TCPA]

claims."); *Branham v. ISI Alarms, Inc.*, 2013 WL 4710588, at \*8 (E.D. N.Y. Aug. 30, 2013) (holding that the defendants should have anticipated that the use of a system "to call a New York cell-phone number could subject them to being hauled into court in New York."); *Heidorn v. BDD Marketing & Mgmt. Co., LLC*, 2013 WL 6571629 (N.D. Cal. Aug. 19, 2013) (finding personal jurisdiction in TCPA case where calls were made to a California resident at a California number).

This Court finds that given the allegations of the Second Amended Complaint, the defendants cannot justifiably argue that they are "mere middlemen." In her memorandum, the plaintiff describes the following scenario:

For example, CenturyLink delivered the call to Level 3 and instructed it to deliver the call to Ms. Mey's West Virginia phone number, and Level 3 did the same to AT&T, who consummated the call to her West Virginia line. Each Defendant was paid to send these calls into West Virginia, each knew the calls were headed to West Virginia, and the calls were in fact received in West Virginia. Because each Defendant profited from its exposure to this market and purposefully availed themselves of the privilege of conducting business here, they are answerable in West Virginia courts for their conduct in making these West Virginia calls. *See UMG Recordings*, 963 F.3d at 354 (rejecting defendant's argument that it lacks control over what advertising is displayed; "it is immaterial whether the third-party advertisers or the defendant targeted [in-state] residents . . . [the defendant] knows — either actually or constructively — about its [in-state] user base, and that it exploits that base for commercial gain."). [Doc. 101 at 12].

7

As noted by plaintiff, courts have held that personal jurisdiction exists even over a defendant playing only a supporting role in the TCPA violation. *See, e.g., Ott v. Mortg. Inv'rs Corp. of Ohio, Inc.*, 65 F.Supp.3d 1046, 1057 (D. Or. 2014) (specific jurisdiction over defendants who had "mere oversight" of telemarketing operation that included phone numbers with in-state area codes); *Hudak v. Berkley Grp., Inc.*, 2014 WL 354676, at \*2 (D. Conn. Jan. 23, 2014) ("Defendants deny that they made any of the calls at issue but do not deny that they caused them to be made."); *Keim v. ADF MidAtlantic, LLC*, 199 F.Supp.3d 1362, 1368 (S.D. Fla. 2016) (specific jurisdiction over defendants hired to send text messages received in-state).

At this point in the litigation, the plaintiff has alleged sufficient facts to support a finding of specific jurisdiction as to all defendants.

**The Second Amended Complaint states a claim against the defendants**.

The defendants next contend that the Second Amended Complaint fails to state a claim, on the basis that they did not make the allegedly offending calls.  But the scope of liability under the TCPA is broader than defendants suggest.  *Cunningham v. Montes*, 378 F.Supp.3d 741, 747 (W.D. Wis. 2019).  The TCPA does not define the term "make," but the question of who can be held liable for violations of the TCPA was addressed extensively in 2015.  *See Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7890 (2015) ("the 2015 FCC Order").[1]

---

[1] Although some sections of 2015 FCC Order were overturned, see *ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 692 (D.C. Cir. 2018), that ruling did not affect the provisions at issue in this case.

The 2015 FCC Order states that "one can violate the TCPA either by 'taking the steps necessary to physically place a telephone call,' or by 'being so involved in the placing of a specific telephone call as to be deemed to have initiated it.' *Id.* at 7890 ¶ 30 (quoting *DISH Network*, 28 FCC Rcd. at 6583 ¶ 27).    And in making this determination, the adjudicator must 'look to the totality of the facts and circumstances surrounding the placing of a particular call.' *Id.* Factors relevant to this analysis include:

1) The extent to which the defendant controls the call's message

2) The extent to which the defendant controls the timing or initiation of the call

3) The extent to which the defendant controls who receives the call

4) Whether the service is "reactive in nature," meaning that it places calls in a manner that is arranged by the customer rather than the defendant

5) The extent to which the defendant "willfully enables fraudulent spoofing of telephone numbers" by offering that functionality to clients

6) The extent to which the defendant "assists telemarketers in blocking Caller ID" by offering that functionality to clients

7) Whether a defendant "who offers a calling platform service for the use of others has knowingly allowed its client(s) to use that platform for unlawful purposes."

*Cunningham v. Montes*, 378 F.Supp.3d 741, 747–48 (W.D. Wis. 2019).

With respect to the 2015 FCC factors, the plaintiff has alleged that each defendant:

- "know[s] when these unlawful spoofed robocalls are being placed through their systems, which effectively 'light up' when the spoofer generates enormous numbers of obviously spoofed calls";

9

- "knew that the caller spoofed an invalid number, and [each] call [alleged in the complaint] was not for a lawful purpose, and that no subscriber could lawfully originate calls from that number," ;

- "could easily block the robocalls from being connected.";

- "could make simple programming changes to stop [the calls],";

- "took the steps necessary to physically place obviously spoofed robocalls to plaintiff and class members,";

- was an "active participant," who "controlled the sending of the spoofed robocalls,";

- passed on the spoofed number "as legitimate, knowing it not to be," "willfully . . . circumventing the accuracy of caller ID," knowing this "increased the likelihood that the recipient would answer the call,";

- "[p]rovided the avenue and means for the Unidentified Spoofer to generate scores of robocalls from an obviously spoofed number," and "knowingly . . . allowed [their services] to be used for unlawful purposes,";

- "profit[ed] from them,";

- "willfully assisted the Unidentified Spoofer in successfully completing the spoofed calls,";

- "willfully enabled the fraudulent spoofing of telephone numbers,";

- "knowingly and willfully played its role and completed the critical steps necessary to make these calls," to consumers already hounded by scores of other nuisance robocalls."

As one court put it, "The 'totality of the circumstances' approach set out in the 2015 FCC Order will not provide easy answers in close cases.  But it makes one thing clear: a provider of auto-dialing services cannot blithely sit back and blame his customers for any TCPA violations that result from their use of his service."  *Cunningham*, 378 F.Supp.3d at 748 (denying defendant summary judgment).  *See also Hurley v. Messer*, 2018 WL 4927218, at *2 (S.D. W.Va. Oct. 10, 2018) (Chambers, J.) ("whether or not [the defendant] may be held liable will depend upon a totality of the circumstances analysis, which is not appropriate on a motion to dismiss given the allegations in this case."); *Couser v. Pre-paid Legal Services, Inc.*, 994 F.Supp.2d 1100, 1103 (S.D. Cal. 2014) ("Whatever the true and exact relationship between [defendant] and its customers is, the Court finds it all too fact-intensive . . . to be resolved at the motion to dismiss phase in [defendant's] favor.").

Courts have refused to dismiss suits where the defendant knew that illegal activity was underway.  In *Hurley v. Messer*, 2018 WL 4854082 (S.D. W.Va. Oct. 4, 2018) (Chambers, J.), the district court refused to dismiss TCPA claims against VoIP providers who knew of the caller's illegal conduct and could have stopped it, but nevertheless permitted robocalls to be broadcast through their systems.  The court analyzed the factors listed in the 2015 FCC Order and concluded that the allegations "state a plausible claim that [the VoIP providers] offered a calling platform and 'knowingly allowed [their] client(s) to use that platform for unlawful purposes.'"  *Id.* at *4 (quoting 2015 FCC Order ¶ 30).

Similarly, a week later, the same Court denied dismissal of TCPA claims against another defendant alleged to have knowingly allowed its autodialing software to be used for an unlawful purpose.  *Hurley v. Messer*, 2018 WL 4927218 (S.D. W.Va. Oct. 10, 2018) (Chambers, J.).

11

In addition, in *Bauman v. Saxe*, 2019 WL 591439, at *6 (D. Nev. Feb. 13, 2019),
the Court held that a text platform provider who offered functionality allowing clients to
bypass spam filters faced potential TCPA liability. *See also Wick v. Twilio Inc.*, 2017 WL
2964855 (W.D. Wash. July 12, 2017).

In sum, drawing all reasonable inferences in plaintiff's favor, the totality of the
allegations support a plausible inference that the defendants are liable.

**The defendants are not immune from TCPA liability as common carriers.**

The defendants next contend that as common carriers, they are immune from
liability under the TCPA. The defendants paint with too broad of a brush. As was true in
*De la Cabada v. Ytel, Inc.*, defendants have not identified any authority holding that a
common carrier cannot be held liable under the TCPA — even if it has been found to have
been so involved in the unlawful communications that it can be deemed to have made
them. Indeed, the authority is to the contrary. *See, e.g., Linlor v. Five9, Inc.*, 2017 WL
2972447, at *4 (S.D. Cal. July 12, 2017) (noting that "[c]ommon carriers are not liable
under the TCPA **absent** a high degree of involvement or actual notice of an illegal use and
failure to take steps to prevent such transmissions") (emphasis added) (internal quotation
marks and citation omitted). 2020 WL 1156909, at *5 (N.D. Cal. Mar. 10, 2020).

In *FTC v. Educare Centre Services, Inc.*, 433 F.Supp.3d 1008 (W.D. Tex. 2020),
Judge Cardone explained:

> Section 5(a)(2) of the FTC Act exempts common carriers from the FTC's
> jurisdiction. 15 U.S.C. § 45(a)(2). The same is true of the TSR. See 60 Fed.
> Reg. 43842, 43843 (1995) (stating that the Rule does not cover activity
> beyond the jurisdiction of the FTC Act). Instead, regulation of common

12

carriers generally falls under the Federal Communications Commission's jurisdiction. *See generally **FTC v. AT & T Mobility LLC***, 883 F.3d 848, 853–56 (9th Cir. 2018).  For purposes of the exemption, determining whether a given provider is a "common carrier" is an activity-based analysis, as opposed to a status-based one. *Id*. at 850 (explaining that a purported common carrier can only claim immunity "to the extent that a common carrier is engaging in common-carrier services").  In other words, "courts must examine the actual conduct of an entity to determine if it is a common carrier for purposes of the FTC Act exemption." ***FTC v. Verity Int'l, Ltd.***, 443 F.3d 48, 60 (2d Cir. 2006).

Looking to the activity of service providers, then, the FCC's regulatory framework sorts communications services into two categories: "telecommunications services" and "information services."  *See* 47 U.S.C. § 153(46); 47 U.S.C. § 153(20).  Telecommunications service means "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used." 47 U.S.C. 153(53).  Information services means providing "capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications." 47 U.S.C. § 153(20).  Information services are distinguished from telecommunications services, in part, by their inclusion of "protocol conversion"—the "ability to communicate between networks that employ different data-transmission formats"—whereas telecommunications

13

services only transmit without alteration.  *See **PAETEC Comm'ns, Inc. v.
CommPartners, LLC***, 2010 WL 1767193, at \*2 (D.D.C. Feb. 18, 2010)
(quoting ***Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.***, 545
U.S. 967, 975–77 (2005)).  Telecommunications services are subject to the
FCC's jurisdiction, whereas information services are not, and the categories
are mutually exclusive.  *See **Brand X Internet Servs.***, 545 U.S. at 975–76;
***Nat'l Ass'n of Reg. Util. Comm'rs v. FCC***, 851 F.3d 1324, 1325 (D.C. Cir.
2017).

433 F.Supp.3d at 1017.

In ***Educare***, the defendants argued that, because they provide VoIP services, they
are a common carrier under the activity-based analysis.  They asserted that VoIP providers
are "telecommunications carriers" under the Communications Act.  Because
telecommunications carriers are "common carriers" under the FCC's regulatory scheme,
the defendants concluded that they were subject to the common carrier exemption to the
FTC's jurisdiction (citing 47 U.S.C. § 153(51)).  However, the defendants' asserted, but
unsupported, premise—that VoIP providers are "telecommunications carriers"—is a
disputed issue here, and a long-contested one more broadly.  *See **PAETEC Comm'ns,
Inc.***, 2010 WL 1767193, at \*3 (observing, in holding that VoIP provider was providing
information—not telecommunication—services, that "[t]he telecommunications industry has
been raging for years with debate about these arguments") (internal quotation omitted).
433 F.Supp.3d at 1017–18.

The "Eighth Circuit and several district courts have concluded, in thorough opinions,
that VoIP services comparable to those of the [defendants] are best classified as

14

"information services." *Id*. at 1018. *See Lange*, 903 F.3d at 719–20; *PAETEC Comm'ns, Inc.*, 2010 WL 1767193, at \*3; *Sw. Bell Tel., L.P. v. Mo. Pub. Serv. Comm'n*, 461 F.Supp.2d 1055, 1079–83 (E.D. Mo. 2006); *Vonage Holdings Corp. v. N.Y. State Pub. Serv. Comm'n*, 2004 WL 3398572, at \*1 (S.D. N.Y. July 16, 2004); *Vonage Holdings Corp. v. Minn. Pub. Utils. Comm'n*, 290 F.Supp.2d 993, 999 (D. Minn. 2003). Those cases hold that the VoIP providers at issue offered information services because protocol conversion—a defining attribute of information services under *Brand X Internet Services*, 545 U.S. at 975–77—is a necessary feature of their VoIP services. *See, e.g., Lange*, 903 F.3d at 720 ("Spectrum Voice's service is an information service because it makes available information via telecommunications by providing the capability to transform that information through net protocol conversion.") (internal quotations and alteration omitted); *Sw. Bell Tel., L.P.*, 461 F.Supp.2d at 1081 ("Net-protocol conversion is a determinative indicator of whether a service is an enhanced or information service."); *Minn. Pub. Utils. Comm'n*, 290 F.Supp.2d at 999 ("[C]alls in the VoIP format must be transformed . . . before a [traditional] user can receive the call. For calls originating from a [traditional] user, the process . . . is reversed. The Court concludes that Vonage's activities fit within the definition of information services."). *Educare*, 433 F.Supp.3d at 1018.

Similarly, in *Frank v. Cannabis & Glass, LLC*, 2019 WL 4855378 (E.D. Wash. Oct. 1, 2019), the Court stated:

> According to the FCC, generally, common carriers providing telecommunication services are not liable under the TCPA. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*,

7 FCC Rcd. 8752, 8776 n.83 (1992) (concluding that common carriers are not liable under the TCPA absent "a high degree of involvement or actual notice of an illegal use and failure to take steps to prevent such transmission"). A carrier is not entitled to this exemption if it "was so involved in placing the call as to be deemed to have initiated it." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 7980 (2015). In its 2015 Ruling, the FCC clarified that "application providers that play a minimal role in sending text messages are not *per se* liable for unwanted robocalls." *Id*. at 7965. It noted the term "make" is not defined by the TCPA. *Id*. In determining whether an app or user is the maker of the call, the FCC explained that it looks to the "totality of the facts and circumstances surrounding the placing of a particular call to determine: 1) who took the steps necessary to physically place the call; 2) whether another person or entity was so involved in placing the call as to be deemed to have initiated it, considering the goals and purpose of the TCPA." *Id*.

Some of the factors used to evaluate an entity's involvement in placing the call include:

–the extent to which the provider/host controls the messaging

–the extent to which the provider/host controls the timing or sending of the message;

–the extent to which the provider/host controls the recipient list;

–the extent to which the provider/host "willfully enables fraudulent spoofing of telephone numbers;"

–the extent to which the provider/host assists customers in blocking Caller ID;

–whether the provider/host knowingly allows its customers to use the platform in a way that violates the TCPA;

–whether the service or platform is purely reactive in nature, sending messages as proscribed and arranged by the customer.

2015 TCPA Ruling, 30 FCC Rcd. at 7980–84.

2019 WL 4855378, at *2.

"The FTC states that to determine if an entity is a common carrier, it looks to see if the entity is providing 'basic transmission services' or 'enhanced services.'   This distinction centers on whether the entity operates as a 'pipeline service.'   *Amend. of Sec. 64.702 of the Commission's R. and Regulations (Second Computer Inquiry )*, 84 F.C.C.2d 50, 53–54 (F.C.C. 1980) (internal quotation marks omitted).   Put another way, '[a] basic transmission service is the common carrier offering of transmission capacity for the movement of information between two or more points.'   *Id*. at 53."   *FTC v. American eVoice, Ltd.*, 242 F.Supp.3d 1119, 1123 (D. Mont. 2017)   (Christensen, C.J.).

"This differs from an 'enhanced service,' which 'combines basic service with computer processing applications that act on the format, content, code, protocol or similar aspects of the subscriber's transmitted information, or provide the subscriber additional, different, or restructured information, or involve subscriber interaction with stored information.'   *Re Second Computer Inquiry*, 77 F.C.C.2d 384, 387 (F.C.C. 1980); *see*

17

*also* **Second Computer Inquiry**, 84 F.C.C.2d at 53–54 ('[A] basic service is the offering of a "transmission pipeline" in contrast to the myriad services that are dependent upon, but different in kind, from the pipeline service.'). Thus, the key point in determining if an entity is a common carrier is whether the entity operates a pipeline transmission service, or whether it provides services that rely upon the pipeline service for their operation." *Id*.

Based upon the allegations of the Second Amended Complaint, this Court cannot find, at this point, that the defendants are entitled to immunity as common carriers.

**The "Spoofer" is not an indispensable party.**

Defendant All-Access Telecom seeks dismissal on the ground that the spoofer and provider are indispensable parties, claiming that they are "required parties." Essentially, the spoofer and provider would be joint tortfeasors. Judge Blake ably addressed this issue in another TCPA action:

> The defendants argue that Robodial is a party "required to be joined if feasible" because the Election Day call was "initiated ... from its facilities" and because a judgment against the defendants "would be binding on Robodial." (Defs.' Mem. at 14.) These arguments are easily rejected. The Attorney General's allegations against the defendants are independent of any potential claims against Robodial. Even if the defendants used Robodial's services to broadcast the recorded message, and even if the Attorney General could potentially sue Robodial in connection with the same alleged violations, Robodial's absence from this case does not affect this court's ability to "accord complete relief among existing parties." Moreover, disposing of this action would not "leave an existing party subject to a

18

substantial risk of incurring double, multiple, or otherwise inconsistent

obligations," nor would it "as a practical matter impair or impede [Robodial's]

ability to protect" any interest it might have in the litigation. Fed.R.Civ.P.

19(a)(1)(B)(i). Even if the defendants are ultimately found liable, and even

if a judgment against the defendants could be relevant to a subsequent

action against Robodial, Robodial would not be bound by any judgment or

factual or legal determination made in this action because it is not a party to

this action. Therefore, Robodial is not a party "required to be joined if

feasible." Accordingly, Rule 19 does not require that Robodial be joined as

a party, or that this court proceed to determine whether the action should be

dismissed under Rule 19(b).

*Maryland v. Universal Elections*, 787 F.Supp.2d 408, 417–18 (D. Md. 2011) (Blake,

J.).

Similarly, in *C-Mart, Inc. v. Metro. Life Ins. Co.*, the Court held:

The Storick Defendants argue that this Court "cannot accord complete relief

among existing parties" if Martino is not joined in this action. In support of

this assertion, the Storick Defendants, who assert that Martino is a "facsimile

broadcaster," rely on the wording of 47 C.F.R. § 64.1200(a)(4)(vii), which

provides: "A facsimile broadcaster *will* be liable for violations of paragraph

(a)(4) of this section, including the inclusion of opt-out notices on unsolicited

advertisements, if it demonstrates a high degree of involvement in, or actual

notice of, the unlawful activity and fails to take steps to prevent such

facsimile transmissions." *Id*. (emphasis added). This argument is without

19

merit, as 47 C.F.R. § 64.1200(a)(4)(vii) provides the basis for a violator's liability; it does not require a plaintiff to bring a claim against all possible violators.

The Motion next argues that because the TCPA does not provide a right for contribution or indemnification, the named Defendants in this action are precluded from securing a remedy against Martino for the harm he purportedly caused. (DE 109 at 14).  However, the fact that Martino is not joined does not inhibit this Court from according complete relief amongst the current Parties.  As asserted by Defendants, Martino appears to be merely a joint tortfeasor.   However, joint tortfeasors need not be named as defendants in a single lawsuit.  ***Temple v. Synthes Corp., Ltd.***, 498 U.S. 5, 7 (1990).

2014 WL 12300313, at *3 (S.D. Fla. July 14, 2014).

This Court holds that the spoofing defendant and provider defendant's absence does not deprive this Court of jurisdiction.

**The TCPA is constitutional with regard to the calls at question in this case.**

Certain defendants contend that Count I of plaintiff's Second Amended Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(1), because this Court lacks subject matter jurisdiction, in that § 227(b)(1)(A) of the TCPA was unconstitutional during the time the calls on which plaintiff rests her claims were made.

In ***Barr v. Amer. Assn. Of Political Consultants, Inc.***, 140 S.Ct. 2335 (2020) ("**Barr**"), the Supreme Court, in a fractured decision, held that the 2015 amendment to the TCPA exempting calls seeking collection of debts to the Government was unconstitutional.

20

While the district courts are split on the issue of whether *Barr* has any effect on the liability of calls other than Government collection calls, the weight of authority appears to be to the effect that those calls and callers are unaffected by *Barr*.

In *Barr*, "Justice Kavanaugh, joined by the Chief Justice and Justice Alito, concluded in Parts I and II that this amendment was unconstitutional because it favored debt-collection speech over political or other speech in violation of the First Amendment. 140 S.Ct. at 2342–48.   In Part III, these three Justices concluded that the 2015 amendment should be severed leaving the bulk of the TCPA intact.   *Id*. at 2348–56. Justice Sotomayor, who concurred, would have based Parts I and II on a different ground (applying intermediate as opposed to strict scrutiny to the speech) but concurred in the conclusion and in Part III with respect to severability.   *Id*. at 2356–57.   Justices Breyer, Ginsburg and Kagan, who dissented in part, disagreed that the amendment violated the First Amendment, but ultimately concurred with Part III finding the amendment severable. Id. at 2357–63.   Justices Gorsuch and Thomas agreed with Parts I and II that the amendment was unconstitutional but dissented on the issue of severability.   *Id*. at 2363–67. Thus, '[s]ix Members of the Court ... conclude[d] that Congress ha[d] impermissibly favored debt-collection speech over political and other speech in violation of the First Amendment' and '[s]even Members of the Court conclude[d] that the entire 1991 robocall restriction should not be invalidated, but rather that the 2015 government-debt exception must be invalidated and severed from the remainder of the statute.'   *Id*. at 2343." *McCurley v. Royal Sea Cruises, Inc.*, 2021 WL 288164 (S.D. Cal. Jan. 28, 2021).

As the Court noted, "the general rule is that 'an unconstitutional statutory amendment "is a nullity" and "void" when enacted, and for that reason has no effect on the original statute.' *AAPC*, 140 S.Ct. at 2353 (quoting *Frost v. Corp. Comm'n of Okla.*, 278 U.S. 515, 526–27 (1929)). If the government debt exception provision was void at its inception in 2015, it would have no effect on the pre-2015 text of the statute. Since there are no constitutional defects to the pre-2015 text, the statute's enforceability is unaffected by the amendment. The conduct at issue here was not impacted by the exception." *Less v. Quest Diagnostics Inc.*, 2021 WL 266548, at *1 (N.D. Ohio Jan. 26, 2021) (Zouhary, J.).

In his decision, Justice Kavanaugh directly addressed the issue, stating:

[A]lthough our decision means the end of the government-debt exception, no one should be penalized or held liable for making robocalls to collect government debt after the effective date of the 2015 government-debt exception and before the entry of final judgment by the District Court on remand in this case, or such date that the lower courts determine is appropriate. . . . On the other side of the ledger, **our decision today does not negate the liability of parties who made robocalls covered by the robocall restriction.**

140 S.Ct. at 2355, n.12.

The cases which are relied upon by the defendants dismissed the above footnote as dicta. *See Lindenbaum v. Realgy, LLC,* 2020 WL 6361915 (N.D. Ohio Oct. 29, 2020), *Creasy v. Charter Comm'ns Inc.*, 2020 WL 5761117 (E.D. La. Sept. 28, 2020) and

*Hussain v. Sullivan Buick-Cadillac-GMC Truck, Inc.*, 2020 WL 7346536 (M.D. Fla. Dec. 11, 2020).

> As noted in *McCurley*, *supra*:
>
> Even if it was only dicta, as argued by Defendant, the district court is not at liberty to completely ignore this pronouncement. *See, e.g., United States v. Montero-Camargo*, 208 F.3d 1122, 1133 n.17 (9th Cir. 2000) ("Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what the court might hold; accordingly we do not blandly shrug them off because they were not a holding.") (quotation omitted). The Eleventh Circuit articulately explained:
>
> > We have always believed that when the Founders penned Article III's reference to the judicial power being rested 'in one Supreme Court and in such inferior Courts' as Congress may establish, they used 'superior' and 'inferior' as contrasting adjectives, with us being on the short end of the contrast.  It would never occur to use to tell the Supreme Court that we would decide our cases based on our analysis of its decisions, not its own analysis of them if that analysis had been announced in a case where it was not essential to the result....
> >
> > [T]here is dicta, and then there is Supreme Court dicta.
>
> *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006) (citation omitted). The Eleventh Circuit cites numerous cases recognizing that "dicta from the Supreme Court is not something to be lightly cast aside." *Id.*; *see, e.g.,*

>    *McCoy v. Mass. Ins. of Tech.*, 950 F.2d 13, 19 (1st Cir. 1991) ("We think
>    that federal appellate courts are bound by the Supreme Court's considered
>    dicta almost as firmly as by the Court's outright holdings, particularly when
>    ... a dictum is of recent vintage and not enfeebled by any subsequent
>    statement."); *Official Comm. Of Unsecured Creditors of Cybergenics
>    Corp. v. Chinery*, 330 F.3d 548, 561 (3rd Cir. 2003) (en banc) ("Although
>    the Committee is doubtless correct that the Supreme Court's dicta are not
>    binding on us, we do not view it lightly."); *Wynne v. Town of Great Falls*,
>    376 F.3d 292, 298 n.3 (4th Cir. 2004) ("[W]ith inferior courts, like ourselves
>    ... carefully considered language of the Supreme Court, even if technically
>    dictum, generally must be treated as authoritative."); *United States v.
>    Becton*, 632 F.2d 1294, 1296 n.3 (5th Cir. 1980) ("We are not bound by
>    dicta, even of our own court.... Dicta of the Supreme Court are, of course,
>    another matter.").

*McCurley*, 2021 WL 288164, at *3.

Most telling, in *American Assoc. of Political Consultants, Inc. v. FCC*, 923 F.3d 159 (4th Cir. 2019), the decision which was affirmed by *Barr*, the Court held:

>    The Plaintiffs maintain in their appellate submissions that the constitutionally
>    flawed debt-collection exemption invalidates the entirety of the automated
>    call ban, rendering severance of the debt-collection exemption improper.
>    The Government argues, however, that the controlling authorities require a
>    severance of the exemption from the automated call ban.

For several reasons, we agree with the Government on the severance issue.  First and foremost, the explicit directives of the Supreme Court and Congress strongly support a severance of the debt-collection exemption from the automated call ban.  Furthermore, the ban can operate effectively in the absence of the debt-collection exemption, which is clearly an outlier among the statutory exemptions.

In circumstances such as these, the Supreme Court has recognized that severance is the preferred remedy.  As the Chief Justice explained in the Court's *NFIB v. Sebelius* decision, if Congress wants the balance of a statute to stand when one aspect is constitutionally flawed, a reviewing court "must leave the rest of the [statute] intact." *See* 567 U.S. 519, 587 (2012). By severing the flawed portion of a statute, the court can limit the impact of its ruling of constitutional infirmity. *See Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 328 (2006); *United States v. Under Seal*, 819 F.3d 715, 721–22 (4th Cir. 2016) (recognizing that severance of a flawed portion of a statute prevents a court from nullifying too much of that enactment).  The general rule is thus " 'that partial ... invalidation [of a statute] is the required course.' " *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)).

Complementing the Supreme Court's strong preference for a severance in these circumstances, Congress has explicitly mandated that, if a TCPA provision is determined to be constitutionally infirm, severance is

25

the appropriate remedy. That is, Congress has directed that, if any part of the TCPA "is held invalid, the remainder ... shall not be affected." *See* 47 U.S.C. § 608. That severability provision eases our inquiry on the severance issue and creates "a presumption that Congress did not intend the validity of the statute in question to depend on the validity of the constitutionally offensive provision." *See Alaska Airlines*, 480 U.S. at 686 (citing *INS v. Chadha*, 462 U.S. 919, 932 (1983)). As a result, severance of the debt-collection exemption from the balance of the automated call ban will comply with the explicit directive of Congress and with controlling Supreme Court precedent.

We are also satisfied that a severance of the debt-collection exemption will not undermine the automated call ban. For twenty-four years, from 1991 until 2015, the automated call ban was "fully operative." *Free Enter. Fund*, 561 U.S. at 509 (citations and internal quotation marks omitted). As a result, the Plaintiffs simply cannot show that excising the debt-collection exemption will hamper the function of the ban. *See Alaska Airlines*, 480 U.S. at 686 (explaining that only "strong evidence" overcomes presumption created by severability clause). In these circumstances, we agree with the Government and direct the severance of the debt-collection exemption from the balance of the automated call ban.

*Am. Ass'n of Pol. Consultants, Inc. v. Fed. Commc'ns Comm'n*, 923 F.3d 159, 171 (4th Cir. 2019), *aff'd sub nom. Barr v. Am. Ass'n of Pol. Consultants, Inc*, 140 S.Ct. 2335 (2020).

Those courts which have found the TCPA to be valid with regard to non-Government debt calls, even in light of *Barr*, include *McCurley*, *supra; Less v. Quest Diagnostics Inc.*, 2021 WL 266548 (N.D. Ohio Jan. 26, 2021); *Stoutt v. Travis Credit Union*, 2021 WL 99636 (E.D. Cal. Jan. 12, 2021); *Rieker v. Nat'l. Car Cure, LLC ,* 2021 WL 210841 (N.D. Fla. Jan. 5, 2021); *Trujillo v. Free Energy Sav. Co., LLC*, 2020 WL 8184336 (C.D. Cal. Dec. 21, 2020); *Shen v. Tricolor California Auto Group, LLC*, 2020 WL 7705888 (C.D. Cal. Dec. 17, 2020); *Abramson v. Federal Ins. Co.*, 2020 WL 7318953 (M.D. Fla. Dec. 11, 2020), *Buchanan v. Sullivan*, 2020 WL 6381563 (D. Neb. Oct. 30, 2020); *Schmitt v. AmerAssist A/R Solutions Inc.*, 2020 WL 6135181 (D. Ariz. Oct. 19, 2020); *Canady v. Bridgecrest Acceptance Corp.*, 2020 WL 5249263 (D. Ariz. Sept. 3, 2020); *Komaiko v. Baker Techs., Inc.*, 2020 WL 5104041 (N.D. Cal. Aug. 11, 2020); and *Burton v. Fundmerica, Inc.*, 2020 WL 4504303 (D. Neb. Aug. 5, 2020).

For all the reasons stated above, this Court finds that the TCPA, except for the 2015 amendment, remains and remained in full force and effect throughout its tenure.

Accordingly, All Access Telecom, Inc.'s Motion to Dismiss **[Doc. 75]** and Defendants Bandwidth Inc., Centurylink, Communications, LLC, Level 3 Communications, LLC, and Inteliquent, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint **[Doc. 78]** are **DENIED**.

It is so **ORDERED**.

The Clerk shall transmit copies of this Order to all counsel on record.

**DATED:** April 23, 2021.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE