## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

### WHEELING DIVISION

DIANA MEY, individually
and on behalf of a proposed class,

      **Plaintiff,**

v.                                          **Civil Action No. 5:19-cv-00237-JPB**

ALL ACCESS TELECOM, INC.;
BANDWIDTH INC.;
CENTURYLINK COMMUNICATIONS, LLC;
LEVEL 3 COMMUNICATIONS, LLC;
INTELIQUENT, INC.;
AFFINITY NETWORK INCORPORATED; and
TELIAX, INC.;

      **Defendants.**

## THIRD AMENDED CLASS ACTION COMPLAINT

1.      Spoofed robocalls — calls generated by scam artists or scofflaw telemarketers who manipulate automatic telephone dialing systems (ATDS) to conceal their identities so they can bombard consumers' phones and dupe them into answering — are a scourge visited upon millions of Americans every day. The Federal Communications Commission's chairman has described them as "real threats to American consumers."[1] By some estimates, nearly half of all calls to cell phones are fraudulent.[2]

---

[1] *See FTC and FCC Host Joint Policy Forum and Consumer Expo to Fight the Scourge of Illegal Robocalls*, FTC.GOV (March 7, 2018), https://www.ftc.gov/news-events/press-releases/2018/03/ftc-fcc-host-joint-policy-forum-consumer-expo-fight-scourge.

[2] Press Release, First Orion, Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by 2019 (Sept. 12, 2018, 10:03 ET), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html.

4837-3563-2618, v. 1

2.      This is an action against companies that place and connect "obviously spoofed" robocalls – that is, calls displaying facially invalid calling numbers that do not and cannot validly exist, such as eleven-digit or all-zero phone numbers, but nonetheless are made by companies like the Defendants to buzz, ring, and annoy American consumers on their cell phones.

3.      Telephone numbers that are not assigned to any telephone subscriber (here, "485-421-5423-4," and "000-000-0000"), but nonetheless display on the recipient's caller ID, are obviously spoofed.

4.      There is no legitimate reason for Defendants to transmit an autodialed call from an obviously spoofed number, as no person or business could be assigned an eleven-digit or all-zero number.[3]

5.      Telephone service providers like the Defendants know this, and can easily identify and block these calls.[4]  They do not do so because spoofed robocalls make them millions of dollars — not only because they are paid for making the calls through their systems, but also because they sell consumers services that help block spoofed robocalls and fix the very problem they themselves have enabled. These companies make money coming and going from spoofed robocalls.

6.      Here's how the system works:

a.      An "Unidentified Spoofer" pays a telephone communications provider, such as a VoIP ("voice over internet protocol" company), to place hundreds of thousands or even millions of calls each day to consumers

---

[3] *See* In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls, 32 F.C.C. Rcd. 9706, 9714 ¶ 20 (2017).
[4] *Id.* at 9709 ¶ 9.

using an ATDS. The Unidentified Spoofer sends thousands of these calls practically simultaneously.

b.    The VoIP provider allows the Unidentified Spoofer to set the displayed number to an eleven-digit or all-zero number, which the VoIP provider knows is invalid and illegitimate.

c.    In return, the Unidentified Spoofer pays the VoIP provider for the use of its platform for those unlawful purposes.

d.    The VoIP provider then pays a series of other downstream telephone providers ("Downstream Providers") to pass along the obviously invalid calling number and connect the calls to the recipient.

e.    These Downstream Providers know the calls coursing their systems are illegitimate and invalid, and that no subscriber could lawfully originate calls from that number.

f.    These Downstream Providers could easily block the robocalls from being connected, 47 C.F.R. § 64.1200(k)(2)(i), but they elect not to because they profit from them.

7.    Each Defendant knowingly and willfully played its role and completed the critical steps necessary to make these calls.

8.    Each Defendant performed an essential and inextricable role in making these unlawful calls to consumers.

9.    Each Defendant willfully enabled the fraudulent spoofing of telephone numbers.

4837-3563-2618, v. 1

10.     Each Defendant willfully assisted the Unidentified Spoofer in successfully completing the spoofed calls, with the invalid eleven-digit or all-zero number being identified as the calling number.

11.     Each Defendant knew that by sending the calling number as the requested eleven-digit or all-zero number, rather than by truthfully identifying the calling number as invalid, it increased the likelihood that the recipient would answer the call.

12.     By passing the requested calling number as legitimate, knowing it not to be, each Defendant willfully assisted the Unidentified Spoofer in circumventing the accuracy of Caller ID, further playing an essential role in making these calls.

13.     Defendants know when these unlawful spoofed robocalls are being placed through their systems, which effectively "light up" when the spoofer generates enormous numbers of obviously spoofed calls.

14.     Defendants could make simple programming changes to stop them. Nonetheless, they willfully and knowingly make the calls to consumers already hounded by scores of other nuisance robocalls.

15.     As but one example, Defendant CenturyLink/Lumen has told the FCC that it "analyzes traffic to spot mass calling events" and "blocks invalid numbers."[5]

16.     By their conduct, the Defendants:

    a.     Provided the avenue and means for the Unidentified Spoofer to generate scores of robocalls from an obviously spoofed number;

    b.     Willfully enabled fraudulent spoofing and knowingly offered their

---

[5] Letter from CenturyLink/Lumen to FCC (July 10, 2019), https://docs.fcc.gov/public/attachments/DOC-358443A4.pdf.

services and allowed them to be used for unlawful purposes by

transmitting the calls to Plaintiff and class members;

c.      Took the steps necessary to physically place obviously spoofed robocalls

to Plaintiff and class members;

d.      Elected to pass along the requested calling number as valid, knowing that

it is not;

e.      Made the conscious decision to allow the obviously spoofed robocalls to

transmit to Plaintiff and class members;

f.      Were active participants in placing and making, and took steps necessary

to place and make, obviously spoofed robocalls to Plaintiff and class

members;

g.      Controlled the sending of the spoofed robocalls, and could have easily

stopped them; and

h.      Were so involved in the placing of obviously spoofed robocalls to Plaintiff

and consumers as to be directly liable for initiating and making those calls.

17.     Through this action, Plaintiff intends to hold these Defendants accountable for

making obviously spoofed robocalls, which constitute serial violations of federal law prohibiting

autodialed telephone calls placed to cellular and residential lines without consent.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2).

19.     This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because

this action alleges violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C.

§ 227 *et seq.*

20.     The Defendants are subject to this Court's personal jurisdiction because the calls the Defendants made were received by Plaintiff, a resident of West Virginia, in this District.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b)-(d) because the Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction when the action is commenced, and the Defendants' contacts with this District are sufficient to subject them to personal jurisdiction.  Venue is also proper because the acts giving rise to this action occurred in and were directed to Plaintiff in this District.

## PARTIES

22.     Plaintiff Diana Mey is a resident of Wheeling, West Virginia.

23.     The following Defendants are VoIP providers or Downstream Providers, and made the robocalls initially transmitted by Unidentified Spoofers:

a.      Defendant All Access Telecom, Inc. is a New York corporation, with a principal place of business in Forney, Texas. All Access is a gateway into the United States for many foreign-originated scam robocalls.[6]

b.      Defendant Bandwidth Inc. is a Delaware corporation, with a principal place of business in Raleigh, North Carolina. Bandwidth made the calls alleged herein, despite the fact that it had "developed call-blocking tools to prevent calls with specific unlawful telephone number characteristics from traversing the Bandwidth network," and that it "regularly analyzed

---

[6] *Enforcement Bureau Requests All Access Support in Robocall Traceback*, FCC.gov, https://www.fcc.gov/document/enforcement-bureau-requests-all-access-support-robocall-traceback; *see also* Letter from FCC to Lamar Carter of All Access (Feb. 4, 2020), https://docs.fcc.gov/public/attachments/DOC-362250A1.pdf.

6

network traffic for unlawful robocall campaigns."[7]

    c.    Defendant Inteliquent, Inc. is an Illinois corporation, with a principal place of business in Chicago.

    d.    Defendant CenturyLink Communications, LLC is a Delaware corporation, with a principal place of business in Monroe, Louisiana.

    e.    Defendant Level 3 Communications, LLC is a Delaware corporation, with a principal place of business in Broomfield, Colorado. Defendants CenturyLink Communications, LLC and Level 3 Communications, LLC are referred to herein as "CenturyLink/Lumen."

    f.    Defendant Affinity Network Incorporated ("ANI") is a California corporation, with a principal place of business in Las Vegas, Nevada.

    g.    Defendant Teliax, Inc. is a Colorado corporation, with a principal place of business in Denver.

## THE CALLS

24.    All calls outlined below were obviously spoofed. The numbers from which the calls originated — either "485-421-5423-4" or "000-000-0000" — are illegitimate telephone numbers that could not be assigned to any telephone subscriber.

25.    Each Defendant knew that the caller spoofed an invalid number, and the call was not for a lawful purpose, but each nonetheless made the calls for transmission to Plaintiff and class members.

---

[7] Letter from Bandwidth to FCC (November 19, 2018), https://ecfsapi.fcc.gov/file/v 11192867220688/David%20Morken%20Response%20Letter%20to%20Chairman%20Pai%20re %20SHAKEN%20STIR%20Implementation(Final%2011.19.18)-signed.pdf.

4837-3563-2618, v. 1

26.     All calls were placed to (XXX) XXX-7346, Plaintiff's cellular and residential telephone line.

27.     The following summarizes the calls the Defendants made to Plaintiff:

### Call Summary

| Call No. | Caller ID | Made by | Date | Time |
|---|---|---|---|---|
| One | 000-000-0000 | All Access Inteliquent | 01/02/18 | 10:15 AM Eastern |
| Two | 000-000-0000 | All Access Inteliquent | 01/09/18 | 1:42 PM Eastern |
| Three | 000-000-0000 | All Access Inteliquent | 01/11/18 | 1:30 PM Eastern |
|  |  |  |  |  |
| Four | 485-421-5423-4 | All Access CenturyLink/Lumen | 12/14/18 | 3:43 PM Eastern |
| Five | 485-421-5423-4 | All Access CenturyLink/Lumen | 12/15/18 | 1:42 PM Eastern |
| Six | 485-421-5423-4 | All Access CenturyLink/Lumen | 02/05/19 | 11:28 AM Eastern |
| Seven | 485-421-5423-4 | All Access CenturyLink/Lumen | 03/06/19 | 1:32 PM Eastern |
|  |  |  |  |  |
| Eight | 485-421-5423-4 | All Access CenturyLink/Lumen Bandwidth | 01/04/19 | 4:43 PM Eastern |
| Nine | 485-421-5423-4 | All Access CenturyLink/Lumen Bandwidth | 12/25/18 | 12:11 PM Eastern |
|  |  |  |  |  |
| Ten | 000-000-0000 | All Access Inteliquent | 05/31/18 | 1:00 PM Eastern |
|  |  |  |  |  |
| Eleven | 000-000-0000 | Teliax ANI | 2/13/18 | 4:44 PM Eastern |

4837-3563-2618, v. 1

*Calls One, Two, and Three –*
*"Heather from Cardholder Services" Calls from "000-000-0000,"*
*Made by Defendants All Access and Inteliquent*

28.     Prerecorded calls from "cardholder services" and variants of that term are a major

source of consumer complaints about scam robocalls.[8]

29.     As outlined below, Plaintiff received numerous calls from "Heather from

Cardholder Services," each made in the same way.

30.     An Unidentified Spoofer masquerading behind a 000-000-0000 origination

number initially transmitted the call, which was placed to and made by Defendant All Access;

was placed to and made by Defendant Inteliquent; and was received by Plaintiff on her (XXX)

XXX-7346 number.

31.     All three calls were obviously spoofed. The number from which the calls

originated is fake and could not be assigned to any telephone subscriber.

32.     Each of these Defendants knew this, but each nonetheless made the calls to

Plaintiff and class members.

33.     ***Call One***. On January 2, 2018, at 10:15 AM Eastern, Plaintiff received a call

made by Defendants All Access and Inteliquent on her -7346 number, displaying "000-000-

0000" on her caller ID.

---

[8] *See FTC Leads Joint Law Enforcement Effort Against Companies That Allegedly Made Deceptive Cardholder Services Robocalls*, FTC.gov (Nov. 1, 2012), https://www.ftc.gov/news-events/press-releases/2012/11/ftc-leads-joint-law-enforcement-effort-against-companies (announcing FTC action against companies responsible for millions of "cardholder services" calls); *FTC Sends Refunds to Victims of Robocall Credit Card Interest Rate Reduction Scheme*, FTC.gov (September 4, 2012), https://www.ftc.gov/news-events/press-releases/2012/09/ftc-sends-refunds-victims-robocall-credit-card-interest-rate (announcing refunds to consumers who fell victim to "Heather from Card Services" calls); Minn. Attorney Gen., Card Services Scams, https://www.ag.state.mn.us/Brochures/pubCardServicesScams.pdf (warning consumers of scam calls from "cardholder services).

34.     Plaintiff answered the call and heard a pause before hearing a prerecorded message:

> Hi, this is Heather calling from the cardholder services department. Are you struggling with credit card debt? Then you need to be aware that the new laws going into effect in October favor the credit card companies and make it much tougher on consumers and the big banks have just doubled your minimum payment requirements. But there is something you can do about it. The good news is that you're now eligible to lower your interest rates on all your major credit cards which will save you thousands of dollars a year. To qualify, you need at least two thousand five hundred dollars in debt and have at least one account in good standing. But you must act now before your eligibility expires. Please consider this your final notice. Press one to lower your interest rates. To lower your interest rates, press one now.

35.     Plaintiff pressed one to identify the caller, and then heard another prerecorded message asking her to stay on the line for a polltaker to ask a few more questions. A male with a heavy accent, perhaps Indian, answered, said thanks for responding, and asked how Plaintiff was doing. Plaintiff disconnected the call.

36.     ***Call Two***. On January 9, 2018, at 1:42 PM Eastern, Plaintiff received another call made by Defendants All Access and Inteliquent on her -7346 number, also displaying "000-000-0000" on her caller ID.

37.     Plaintiff's answering machine picked up the call and, after a pause, recorded a message. The recorded message included the same prerecorded message as Call One.

38.     ***Call Three***. On January 11, 2018, at 1:30 PM Eastern, Plaintiff received a third call made by All Access and Inteliquent on her -7346 telephone number, again displaying "000-000-0000" on her caller ID.

39.     Plaintiff's answering machine picked up the call and, after a pause, recorded a message. The recorded message included the same prerecorded message as Calls One and Two.

***Calls Four through Nine –***
***Fraudulent Medicare Calls from "485-421-5423-4,"***
***Made by Defendants All Access and CenturyLink/Lumen (calls Four through Seven),***
***and All Access, CenturyLink/Lumen, and Bandwidth (calls Eight and Nine)***

40.     Millions of scam Medicare calls are made to consumers each year. The FTC, FCC, and Better Business Bureau each have webpages dedicated to warning consumers about them.[9]

41.     As outlined below, Plaintiff received numerous fraudulent calls purporting to be about Medicare, each made in the same way.

42.     An Unidentified Spoofer masquerading behind a 485-421-5423-4 origination number initially transmitted calls ***Four*** through ***Seven,*** which were placed to and made by Defendant All Access, placed to and made by Defendant CenturyLink/Lumen, and received by Plaintiff on her -7346 telephone number.

43.     Calls ***Eight*** and ***Nine*** were made the same way as calls ***Four*** through ***Seven***, but also were placed to and made by Defendant Bandwidth.

44.     All these calls were obviously spoofed. The number from which the calls originated is fake and could not be assigned to any telephone subscriber.

45.     Defendants All Access, CenturyLink/Lumen, and Bandwidth knew this, but each nonetheless made the calls to Plaintiff and class members.

---

[9] *See* Lisa Weintraub Schifferle, *Protect yourself against Medicare Scams* (March 15, 2019), https://www.consumer.ftc.gov/blog/2019/03/protect-yourself-against-medicare-scams; *Beware New Medicare Card Scams* (May 29, 2019), https://www.fcc.gov/beware-new-medicare-card-scams; Int'l Ass'n of Better Business Bureaus, *BBB Scam Alert: Don't Pick Up for Fake Medicare Calls*, Better Business Bureau (May 29, 2020), https://www.bbb.org/article/scams/17222-scam-alert-dont-pick-up-for-fake-medicare-calls.

46.     *Call Four*. On December 14, 2018 at 3:43 PM Eastern, Plaintiff received a call made by Defendants All Access and CenturyLink/Lumen on her -7346 number, displaying "485-421-5423-4" on her caller ID.

47.     Plaintiff's answering machine picked up the call and, after a pause, recorded a message. The recorded message included a man with a heavy accent, perhaps Indian, who said he was calling from Medicare. There was call-center noise in the background, including persons with perhaps Indian accents. The caller disconnected when he realized he reached an answering machine.

48.     *Call Five*. On December 15, 2018 at 1:42 PM Eastern, Plaintiff again received a second call made by Defendants All Access and CenturyLink/Lumen on her -7346 number, displaying "485-421-5423-4" on her caller ID.

49.     This time, Plaintiff answered the call. Plaintiff then heard a pause, and a man with a heavy accent, perhaps Indian, came on the line. He said his name was "Michael," and that he was calling from Medicare. "Michael" asked Plaintiff if she had received a letter from Medicare in the last few days. Plaintiff said she had not. "Michael" apologized and said he would like to inform Plaintiff that Medicare was going to "de-active the red, white and blue card." Plaintiff hung up on the call.

50.     *Call Six*. On February 5, 2019, at 11:28 AM Eastern, Plaintiff received a third call made by Defendants All Access and CenturyLink/Lumen on her -7346 number, displaying "485-421-5423-4" on her caller ID.

51.     Plaintiff's answering machine picked up the call and, after a pause, recorded a message. The recorded message included a man with a heavy accent, perhaps Indian, who said

12

4837-3563-2618, v. 1

he was calling from Medicare. There was familiar call-center noise in the background. The caller disconnected when he realized he reached an answering machine.

52.   ***Call Seven***. On March 6, 2019, at 1:32 PM Eastern, Plaintiff received a fourth call made by Defendants All Access and CenturyLink/Lumen again on her -7346 number, displaying "485-421-5423-4" on her caller ID.

53.   Plaintiff's answering machine picked up the call and, after a pause, recorded a message. There was familiar call-center noise in the background. The caller disconnected when he realized he reached an answering machine.

54.   ***Call Eight***. On January 4, 2019, at 4:43 PM Eastern, Plaintiff received a call made by Defendants All Access, CenturyLink/Lumen, and Bandwidth on her -7346 number, displaying "485-421-5423-4" on her caller ID.

55.   Plaintiff's answering machine picked up the call and recorded a message. The recorded message included a man with a heavy accent, perhaps Indian, who said he was calling from Medicare. The caller disconnected when he realized he had reached an answering machine.

56.   ***Call Nine.*** On Christmas Day, December 25, 2018, at 12:11 PM Eastern, Plaintiff received a second call made by Defendants All Access, CenturyLink/Lumen, and Bandwidth on her -7346 number, displaying "485-421-5423-4" on her caller ID.

57.   Plaintiff heard a momentary pause, and then the familiar call-center noise in the background. Plaintiff said hello several times, but the caller disconnected without saying anything.

4837-3563-2618, v. 1

### Call Ten –
### *"Sarah from Customer Services" Calls from "000-000-000,"*
### *Made by Defendants All Access, and Inteliquent*

58.     Like calls from "Heather," calls from "Sarah from Customer Services" are among the most common consumer complaints related to scams that claim to lower your credit card interest rate.[10]

59.     An Unidentified Spoofer masquerading behind a 000-000-000 origination number initially transmitted the call, which was placed to and made by Defendant All Access; was placed by and made to Defendant Inteliquent; and was received by Plaintiff on her -7346 number.

60.     **Call Ten.** On May 31, 2018, at 1:00 PM Eastern, Plaintiff received a "Sarah from Customer Services" call on her -7346 number, displaying "000-000-0000" on her caller ID.

61.     Plaintiff's answering machine picked up the call and, after a pause, recorded a message. The recorded message included the following prerecorded message: "Sarah from Customer Services in reference to your current credit card account . . . it is urgent that you contact us immediately concerning your eligibility for lowering your interest rate."

62.     This call was obviously spoofed. The number from which the call originated is fake and could not be assigned to any telephone subscriber.

63.     Defendants All Access and Inteliquent knew this, but each nonetheless made the call to Plaintiff and class members.

---

[10] *See Scammers Try to Steal All Your Credit* (January 6, 2020), https://www.fcc.gov/scammers-try-steal-all-your-credit

4837-3563-2618, v. 1

*Call Eleven –*
*"Pain Management Center" calls from "000-000-0000,"*
*Made by Defendants Teliax and ANI*

64.     An Unidentified Spoofer masquerading behind a 000-000-000 origination number initially transmitted the call; was placed to and made by Defendant Teliax; was placed to and made by Defendant ANI; and was received by Plaintiff at her -7346 number.

65.     ***Call Eleven***. On February 13, 2018, at 4:44 PM Eastern, Plaintiff received a call on her -7346 number, displaying "000-000-0000" on her caller ID.

66.     Plaintiff answered the call. After a pause, she heard the caller's voice. The caller had a heavy accent, perhaps Indian, who said he was calling from "Pain Management Center." The caller tried to sell Plaintiff a pain-relieving cream.  Plaintiff told him to stop calling and hung up.

67.     This call was obviously spoofed. The number from which the call originated is fake and could not be assigned to any telephone subscriber.

68.     Defendants Teliax and ANI knew this, but each nonetheless made the call to Plaintiff and class members.

69.     Additionally, Defendant Teliax's records identified the call internally as a  "JUNK" call, but Teliax passed and made the call nonetheless.

*Additional Calls*

70.     Upon information and belief, these Defendants placed numerous other calls to Plaintiff, which Plaintiff expects to confirm through discovery.

71.     For example, Plaintiff received at least another eleven calls from "000-000-000" on her -7346 number and received at least two additional calls from "485-421-5423-4" on that number.

## THE CALLS ARE ILLEGAL

72.     All calls referenced in this Complaint were obviously spoofed.

73.     The numbers from which the call originated are fake and illegitimate telephone numbers that could not be assigned to any telephone subscriber.

74.     Each Defendant knew this, but each nonetheless made the call for transmission to Plaintiff and class members.

75.     All calls referenced in this Complaint were placed in violation of the Truth in Caller ID Act of 2009, which makes it "unlawful for any person within the United States, in connection with any telecommunications service or IP-enabled voice service, to cause any caller identification service to knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value."  42 U.S.C. §227(e)(1).

76.     All the calls from "Heather" and "Sarah" were placed using prerecorded messages.

## ALL CALLS WERE PLACED USING AN ATDS

77.     The calls at issue here were placed using an "automatic telephone dialing system" ("ATDS") as defined in 47 U.S.C. § 227(a)(1).

78.     "To qualify as an 'automatic telephone dialing system,' a device must have the capacity either [1] to store a telephone number using a random or sequential number generator, or [2] to produce a telephone number using a random or sequential number generator[,]" and dial such numbers. *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163, 1167 (2021).

79.     The Unidentified Spoofer who originated each call used a computerized dialing system to originate the calls alleged herein. Only a computerized dialing system will:

        a.   Allow the Unidentified Spoofer to program a Caller ID to show that a call is

16

originating from an all zeros or eleven-digit telephone number, as alleged here;

b.  Allow the Unidentified Spoofer to send prerecorded messages, as alleged here; and

c.  Transmit concurrently a high volume of calls that will be likely to connect with consumers who have no relationship with the Unidentified Spoofer but who will provide personal financial information or purchase the goods or services the Unidentified Spoofer is selling.

80.   The computerized dialing system used to place calls was not a "trigger" or "login notification" system of the sort that was alleged to violate the TCPA in *Facebook*. 141 S. Ct. at 1168, 1170 (describing allegations that Facebook "programm[ed] its equipment to send automated text messages to those numbers each time the associated account was accessed by an unrecognized device or web browser."). The calls to Ms. Mey were not triggered by any action on her part, as she had not previously contacted any of the callers, had no relationship with any of the callers, had no accounts with them, and her phone number was not associated with any of their prior customers.

81.   The computerized dialing systems used to place the calls had:

a.  The capacity to store numbers using a random number generator and dial the numbers;

b.  The capacity to store numbers using a sequential number generator and dial the numbers;

c.  The capacity to generate numbers using a random number generator and dial the numbers; and/or

17

d.   The capacity to generate numbers using a sequential number generator and dial the numbers.

82.   The following facts support these allegations:

a.   Fraudsters and scofflaw telemarketers such as the Unidentified Spoofers use computerized dialing systems to make *en masse*, concurrently-dialed calls in order to generate a call volume that will result in a sufficient number of call recipients who answer the calls and engage with the caller. All such systems have the capacity to do that which is alleged in the preceding paragraph.

b.   Most if not all of these were "phishing" calls, intended not to sell any legitimate product or service, but to obtain personal financial information indiscriminately from any consumer willing to provide it, to be used by the callers to steal the recipient's identity and/or to defraud the recipient.

c.   These calls were patently unlawful, recklessly automated by scofflaws rather than automated by companies with business relationships with the call recipients, such as Facebook believed it had with the call recipient in *Facebook*. 141 S. Ct. at 1168.

d.   All such computerized mass dialing systems have the capacity to use a random or sequential number generator to either store or produce phone numbers to be called. These systems thus satisfy the "necessary feature of an autodialer" described by the Supreme Court in *Facebook*. *Id.* at 1173.

e.   All such computerized mass dialing systems have the capacity to store telephone numbers to be called later using a random or sequential number generator. The Supreme Court in *Facebook* strongly suggested, if not

18

explicitly stated, that this sort of system satisfies the definition of ATDS. *Id.* at 1172.

f.   All such computerized mass dialing systems have the capacity to "use a random number generator to determine the order in which to pick phone numbers from a preproduced list" and dial them—again, a function the Supreme Court in *Facebook* also indicated satisfies the ATDS definition. *Id.* n.7.

g.   All such computerized mass dialing systems have the capacity to reorder telephone numbers sequentially and allow the numbers to be dialed sequentially.

h.   Plaintiff had no relationship with any of the callers and performed no act that would have triggered a computerized dialing system to call her, which evidences the callers obtained her number from a random or sequential number generator. She had not inquired with any entity about "struggling with credit card debt," as referenced in calls One through Three; she was not a Medicare recipient as referenced in Calls Four through Nine; she had not inquired with any company about lowering her credit card interest rate, as referenced in Call Ten; and she had not sought the services of any pain management center, as referenced in Call Eleven.

i.   The number generators produced phone numbers sequentially from an existing list, randomly from an existing list, sequentially from a newly-created list, and/or randomly from a newly-created list. The number generators also had the ability to sequentially sort the phone numbers to be dialed and/or had

19

the ability to randomly order the phone numbers to be dialed. Finally, the callers stored numbers from the random or sequential number generator.

j.   Because the callers' computerized dialing systems successfully dialed Plaintiff's phone number, and because Plaintiff did not trigger the system to dial her number or have any prior relationship with the callers, each caller's computerized dialing system either did or had the capacity to store or produce phone numbers to be dialed. Moreover, because the callers did not otherwise have Plaintiff's phone number, unlike the trigger system in *Facebook,* each caller used a random or sequential number generator to store or produce her number.

k.   Additionally, as alleged *supra,* Plaintiff was met with a distinct pause and delay when she or her answering machine answered calls from the Unidentified Spoofers. This pause and delay is indicative that the caller was using a computerized mass dialing system known as a "predictive dialer," which can and in this case does meet the definition of ATDS.

83.   Unlike the computerized dialing systsems used by the Unidentified Spoofers, smartphones do not meet the definition of an automatic telephone dialing system, and the Unidentified Spoofers did not use smartphones to place the calls at issue.

84.   Smartphones place only a single call at a time, and require the sender of each call either to press send or orally direct the smartphone to send a call. Smartphones therefore cannot be used to place the sort of en masse, concurrently-dialed calls needed to generate the call volume that will result in a sufficient number of call recipients who answer the calls and engage with the caller.

4837-3563-2618, v. 1

85.     Unless the user purchases a separate application or downloads additional software programming, smartphones do not have the capacity to sequentially or randomly dial or store telephone numbers, or to meet the definition of ATDS under *Facebook*.

86.     Unlike cell phones that have an auto-reply feature such as "do not disturb while driving," and unlike the *Facebook* system with its one message for one "trigger," systems such as those at issue here are designed, intended, and used to send calls concurrently, *en masse*.

## CLASS ACTION ALLEGATIONS

87.     Plaintiff brings this action under Rule 23 of the Federal Rules of Civil Procedure on behalf of all other persons or entities similarly situated throughout the United States.

88.     The classes of persons Plaintiffs propose to represent include the following:

CLASS 1 (Count One)

All persons within the United States to whom, within four years prior to the filing of this action, the Defendants (1) made a call, (2) displaying caller ID "485-421-5423-4" or "000-000-0000", (3) to the person's cellular telephone, (4) using an ATDS.

CLASS 2 (Count Two)

All persons within the United States to whom, within four years prior to the filing of this action, the Defendants (1) made a call, (2) displaying caller ID "485-421-5423-4" or "000-000-0000", (3) to a residential telephone line, (43) using an artificial or prerecorded voice.

89.     Excluded from the Class are Defendants; any entities in which they have a controlling interest; their agents and employees; and any Judge to whom this action is assigned and any member of such Judge's staff and immediate family.

90.     The class members are identifiable through telephone records and telephone number databases used to transmit calls to class members.

91.     Numerosity is satisfied. There are hundreds of thousands of class members. Individual joinder of these persons is impracticable.

92.     There are questions of law and fact common to Plaintiff and to the proposed class.

93.     Plaintiff's claims are typical of the claims of class members.

94.     Plaintiff is an adequate representative of the class because her interests do not conflict with the interests of the class members, she will fairly and adequately protect the interests of the class members, and she is represented by counsel skilled and experienced in class actions.

95.     Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy.

96.     The likelihood that individual members of the classes will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

## LEGAL CLAIMS

### Count One
### Violation of § 227(b)(1)(A)(iii) for calls made using an
### ATDS to cellular telephones

97.     Section 227(b) of Title 47 of the United States Code regulates so-called "robocalls"—calls made using an ATDS or an artificial or prerecorded voice.

98.     The statute prohibits calls made to cellular telephones using an ATDS, with an exception for certain emergency calls or calls placed with the prior express consent of the called party. *Id.* § 227(b)(1)(A)(iii).

99.     In other words, with respect to non-consensual, non-emergency calls to cellular telephone lines, ATDS calls are prohibited.

22

100.    The TCPA requires prior "express consent" from the called party with respect to calls placed to cellular telephone lines. Prior express consent is consent that is clearly and unmistakably conveyed by the call recipient to the party placing the call; implied consent is not sufficient.

101.    Persons who receive calls in violation of these provisions may bring an action to recover the greater of the monetary loss caused by the violation, or $500. *Id.* § 227(b)(3). If the Court finds the Defendants willfully or knowingly violated § 227(b), the Court may increase the award up to $1500 per violation. *Id.*

102.    Each Defendant violated 47 U.S.C. § 227(b)(1)(A) by making calls, either directly or through the actions of others, using an ATDS to cellular telephone numbers without the prior express consent of the called party.

103.    The Defendants' violations were willful and/or knowing.

**Count Two**
**Violation of § 227(b)(1)(B) for calls made to any residential telephone**
**using an artificial or prerecorded voice**

104.    Plaintiffs incorporate the allegations from all previous paragraphs as if fully set forth herein.

105.    With respect to Calls One, Two, Three, and Ten, Defendants All Access and Inteliquent violated the TCPA, either directly or through the actions of others, by making calls to Plaintiff's residential telephone lines using an artificial or prerecorded voice. *See* 47 U.S.C. § 227(b)(1)(B).

106.    The Defendants' violations were willful and/or knowing.

4837-3563-2618, v. 1

## RELIEF SOUGHT

Plaintiff requests the following relief:

A.      That the Court certify the class proposed above under Rule 23(b)(3) of the Federal Rules of Civil Procedure;

B.      For each violation of the TCPA, $500 awarded to Plaintiff and each class member;

C.      For each willful or knowing violation of the TCPA, $1500 awarded to Plaintiff and each class member;

D.      That the Defendants, and their agents, or anyone acting on their behalf, be immediately restrained from altering, deleting or destroying any documents or records which could be used to identify the members of the classes; and

E.      That Plaintiff and all class members be granted such other and further relief as is just and equitable under the circumstances.

**Jury trial demanded.**

Dated:  May 21, 2021                    Respectfully submitted,

  _/s/ John W. Barrett_
John W. Barrett (WV Bar No. 7289)
Jonathan R. Marshall (WV Bar No. 10580)
Benjamin J. Hogan (WV Bar No. 12997)
BAILEY & GLASSER LLP
209 Capitol Street
Charleston, WV 25301
Telephone: 304-345-6555
Facsimile:  304-342-1110
JBarrett@baileyglasser.com
JMarshall@baileyglasser.com
BHogan@baileyglasser.com

William Howard (admitted *pro hac vice*)
THE CONSUMER PROTECTION FIRM
401 East Jackson Street, Suite 2340
SunTrust Financial Center

4837-3563-2618, v. 1

Tampa, FL 33602
Telephone: 813-500-1500
Facsimile: 813-435-2369
Billy@TheConsumerProtectionFirm.com

Yvette Golan (admitted *pro hac vice*)
THE GOLAN FIRM
2000 M Street NW, Suite 750-A
Washington, DC 20036
Telephone: 866-298-4150 ext. 101
Facsimile: 928-441-8250
YGolan@tgfirm.com

4837-3563-2618, v. 1