IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling

**DIANA MEY**, individually and
on behalf of a proposed class,

                Plaintiff,

v.                                               **Civil Action No. 5:19-CV-237**
                                                     Judge Bailey

**ALL ACCESS TELECOM, INC.,**
**BANDWIDTH, INC., INTELIQUENT, INC.,**
**NOS COMMUNICATIONS, INC.,**
**TELIAX, INC., CENTURY LINK**
**COMMUNICATIONS, INC., LEVEL**
**3 COMMUNICATIONS, INC.**, and
**AFFINITY NETWORK INCORPORATED**,

                Defendants.

## ORDER DENYING MOTION FOR PRIMARY JURISDICTION REFERRAL

Pending before this Court is Bandwidth, Inc.'s Motion for Primary Jurisdiction [Doc. 176] seeking referral to the Federal Communications Commission ("FCC") of the following question: "In what, if any, circumstances could an intermediate carrier's transmission of calls originating from non-standard telephone numbers constitute a violation of the TCPA?" The Motion has been briefed *ad nauseam* and is ripe for decision. For the reasons hereinafter stated, the Motion will be denied.

At the outset, this Court notes that the issue which the defendants wish to have referred to the FCC is not the issue in this case. The issue is not about all nonstandard numbers, but invalid numbers. Nor is it about all intermediate providers, but about enforcing the TCPA

1

against those who make and profit from obviously spoofed robocalls under a theory of liability grounded in the FCC's current and clear guidance.

As this Court has already explained, "the scope of liability under the TCPA is broader than defendants suggest" because "one can violate the TCPA either by 'taking the steps necessary to physically place a telephone call,' or by 'being so involved in the placing of a specific telephone call as to be deemed to have initiated it.'" (quoting Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 30 FCC Rcd. 7961, 7890 ¶ 30 ("2015 FCC Order") (emphasis added)). [Doc. 129 at 9]. Plaintiff's claims require consideration of a variety of factors that turn on the specific facts of this case and can be decided only by a jury. [Id. at 9–12].

Simply stated, this case is not about blocking "all calls from non-standard numbers" as defendants claim. It's about calls from invalid numbers which the defendants know are unlawful and could easily stop. According to plaintiff, the defendants willingly and actively participate in making the calls because they are paid millions for their essential roles. Because this case raises issues that are well within this Court's expertise and experience, there is no reason to refer to the FCC.

The primary jurisdiction doctrine enables a court to "refer" certain issues to an administrative agency and then stay the proceedings or dismiss the case without prejudice. See **Reiter v. Cooper**, 507 U.S. 258, 268–69 (1993). This doctrine "allows a federal court to refer a matter extending beyond the 'conventional experiences of judges' or 'falling within the realm of administrative discretion' to an administrative agency with more specialized experience, expertise, and insight." **Nat'l Commc'ns Ass'n v. AT&T**, 46 F.3d 220, 222–23

(2d Cir. 1995) (quoting *Far E. Conference v. United States*, 342 U.S. 570, 574 (1952)). Thus, "in circumstances in which federal litigation raises a difficult, technical question that falls within the expertise of a particular agency," a court may refer a case to the appropriate agency. *Piney Run Pres. Ass'n v. Cty. Comm'rs of Carroll Cty.*, 268 F.3d 255, 262 n.7 (4th Cir. 2001).

Although there is "no fixed formula . . . for applying the doctrine of primary jurisdiction," *Envtl. Tech Council v. Sierra Club*, 98 F.3d 774, 789 (4th Cir. 1996), courts often employ a four factor test to focus the analysis:

> (1) whether the question at issue is within the conventional experience of judges or it is within the agency's particular field of expertise;
>
> (2) whether the question at issue is particularly within the agency's discretion;
>
> (3) whether there exists a substantial danger of inconsistent rulings; and
>
> (4) whether a prior application to the agency has been made.

*Cent. Tel. Co. of Virginia v. Sprint Commc'ns Co. of Virginia*, 759 F.Supp.2d 772, 786 (E.D. Va. 2011) (Payne, J.), *aff'd*, 715 F.3d 501 (4th Cir. 2013).

This Court has already clearly identified the legal and factual issues central to determining defendants' liability in its April 23 Order—i.e., whether the defendants were "so involved in the placing of a specific telephone call as to be deemed to have initiated it." [Doc. 126 at 9–12]. The answer to that question depends on clearly established law, the "totality of the circumstances," and a fact-bound test. [Id.]. As such, the "[r]esolution of this dispute necessitates neither establishing future telecommunications policy nor assessing existing policy," but instead "necessitates only exacting scrutiny" of the facts applied to

well-established legal framework. ***Cent. Tel. Co. of Virginia***, 759 F.Supp.2d at 787–88. While the defendants attempt to recast the issue before the Court as a broad "unanswered question of whether an intermediate carrier can be held liable for transmitting traffic originating from nonstandard telephone numbers[ ]" [Doc. 177 at 3], that misstates the issues in this case. This case is not about imposing blanket liability on intermediate providers who transmit calls originating from all "non-standard numbers." [Id.]. Nor is about "all calls from non-standard numbers." [Id. at 3–4]. This case is not based upon a theory of liability as "based on a supposed obligation to block calls" that would require the Court to wade into telecom policy.

The only issue arguably raised in plaintiff's case is whether intermediate carriers *may* block calls from invalid numbers. The FCC answered this question years ago, determining that intermediate carriers can and should block such calls. According to FCC's 2017 guidance, defendants "may block calls purportedly originating from numbers that are not valid," including "those that use an unassigned area code," those "that do not contain the requisite number of digits," and those "that are a single digit repeated, such as 000-000-0000." ***In the Matter of Advanced Methods to Target & Eliminate Unlawful Robocalls***, 32 F.C.C. Rcd. 9706, 9713 (2017). "[B]ecause these numbers are not valid, a subscriber could not lawfully originate calls from such numbers and these calls should be blocked." *Id*. at 9713–14. In other words, most calls with extra digits or a single digit repeated are precisely the kinds of calls that are so clearly invalid, that blocking them does not present the risk of "erroneously blocking legitimate calls" as the defendants claim to fear.

Courts regularly interpret statutes and apply agency guidance without referring cases out. For example, in **Beiler v. GC Servs. L.P.**, 2014 WL 5531169 (M.D. N.C. Nov. 3, 2014) (Schroeder, J.), the court denied a motion to stay pending the resolution of four pending petitions for rulemaking submitted to the FCC, noting the uncertainty regarding how long the FCC would take to issue a final order along with the fact that statutory interpretation was well within the purview of the court. *Id*. at *5 (explaining that applying and interpreting "statutory terms do not require the FCC's policy expertise or specialized knowledge and are matters safely within the conventional experience of judges") (internal quotation marks omitted)); see also **Wilson v. PL Phase One Operations L.P.**, 422 F.Supp.3d 971, 986 (D. Md. 2019) (Chasanow, J.) (denying motion for primary jurisdiction referral on the question of whether defendants used an ATDS because, "although technical, [it was] within the conventional expertise of judges").

Defendants could have blocked the call traffic at issue here under then-existing FCC guidance. The factual and legal question before the Court is whether defendants were "so involved in the placing of a specific telephone call as to be deemed to have initiated it" such that they could be held liable. [Doc. 126 at 9] (quoting 2015 FCC Order at 7890 ¶ 30). Under this Court's ruling on the motions to dismiss, plaintiff has stated a plausible claim that this test is satisfied—a finding well within the conventional experience of this Court.

It is also telling to note that while the defendants claim that this Court lacks the expertise to rule on the issues presented in this case, the defendants filed motions to dismiss teeing up the issues for this Court, long before they sought the involvement of the FCC.

Plaintiff's case has nothing to do with "extrapolat[ing] into policy areas outside the

expertise of any judge" or meddling with unknown agency policy, proposed regulations, or pending petitions. [Doc. 177 at 3]. Instead, as explained above, plaintiff seeks to hold defendants responsible for violating current statutory provisions and current regulations.

The FCC identified several factors relevant "in determining whether the platform provider is so involved in placing the calls as to be deemed to have initiated them." *See* 2015 FCC Order at ¶ 30 & n.110. For example, the Court must determine whether the entity "willfully enables fraudulent spoofing of telephone numbers or assists telemarketers in blocking Caller ID," "knowingly allowed its client(s) to use [its] platform for unlawful purposes[,]" or allows a client to use its services after being notified that its clients are using it unlawfully. Id. "[T]wo principles emerge from the 2015 FCC Order: TCPA liability attaches to those who control or are deeply involved in making specific calls, and to those who knowingly allow an auto-dialing system to be used to make prohibited robocalls." **Cunningham v. Montes**, 378 F.Supp.3d 741, 748 (W.D. Wis. 2019).

Although defendants may wish that the FCC or Congress had carved out a blanket exception to their liability, that wish does not support primary jurisdiction referral. Intermediate providers have never been immune from suit under the TCPA, and defendants cannot point to anything that suggests they ought to be. "Contrary to [defendant's] argument, the FCC has not created a blanket rule immunizing from TCPA liability cloud-based service providers that transmit third party content. Rather, the totality of the facts and circumstances surrounding the call must be considered[.]" **Wick v. Twilio**, 2017 WL 2964855, at *4 (W.D. Wash. July 12, 2017). Although the "'totality of the circumstances' approach set out in the 2015 FCC Order will not provide easy answers in close cases, . . . it makes one thing clear: a provider of

6

auto-dialing services cannot blithely sit back and blame his customers for any TCPA violations that result from their use of his service." ***Cunningham***, 378 F.Supp.3d at 748.

The risk of inconsistent rulings is no greater in this case than in any other statute-based case in federal court. In another attempt to make this case seem like it is something more than a TCPA case based on a well-established theory of direct liability, defendants suggest that if they are found liable it will only be by a "blanket ruling . . . that would obligate intermediate carriers to effectively block all calls from non-standard numbers." [Doc. 177 at 4]. Defendants also contend that the "facts of this case are applicable to every intermediate carrier." [Id. at 12]. This Court does not accept this argument. A finding of liability here is not an issue of "broad applicability" as Bandwidth contends. [Id.] Rather, such a finding would mean that the jury determined, as a matter of fact, that the defendants were "so involved in the placing of [the unlawful calls] as to be deemed to have initiated it." 2015 FCC Order at 7890 ¶ 30.

A finding of liability here turns on questions of fact specific to defendants and the conduct underlying the calls at issue as applied to the test established by the FCC and recognized by this Court in its prior Order. [Doc. 126 at 9–12]. The following is just a sampling of the types of fact-bound questions a jury will have to determine: Did defendants know the calls were invalid? Did they turn a blind eye to the invalid calls to turn a profit? Did their business model depend on a high volume of invalid calls to succeed? Did they receive complaints about these calls or the other entities involved? Did defendants assist the spoofers by offering functionality that allowed them to mask their identity? Did defendants knowingly offer their services for the use of others who use their platform for unlawful

purposes? Put simply, the issue of whether these defendants were so involved in making the illegal calls such that they are liable under the TCPA is not a question of policy; it's a question of fact specific to the defendants in this litigation. And any ruling will be similarly narrow and limited in scope and reach.

As such, there is no risk of inconsistent rulings or a blanket order imposing some broad regulatory requirement on any other intermediate voice service provider.

For the reasons stated above, Bandwidth, Inc.'s Motion for Primary Jurisdiction [**Doc. 176**] is **DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record.

**DATED:** September 30, 2021.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE